(Slip Opinion)          OCTOBER TERM, 2010          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DePIERRE *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 09–1533.   Argued February 28, 2011—Decided June 9, 2011

In 1986, increasing public concern over the dangers of illicit drugs—in particular, the new phenomenon of crack cocaine—prompted Congress to revise the penalties for criminal offenses involving cocaine-related substances.  Following several hearings, Congress enacted the Anti-Drug Abuse Act of 1986 (ADAA).  The statute provides a mandatory 10-year minimum sentence for certain drug offenses involving "(ii) 5 kilograms or more of a mixture or substance containing a detectable amount of . . . (II) cocaine, its salts, optical and geometric isomers, and salts of isomers, [or] (iii) 50 grams or more of a mixture or substance described in clause (ii) which contains cocaine base."  21 U. S. C. §841(b)(1)(A).  The statute similarly provides a 5-year sentence for offenses involving 500 grams of a substance enumerated in clause (ii) or 5 grams of one outlined in clause (iii).  §841(b)(1)(B).

  In 2005, petitioner DePierre was indicted for distribution of 50 grams or more of cocaine base under §§841(a)(1) and (b)(1)(A)(iii). The District Court declined DePierre's request that the jury be instructed that, in order to find DePierre guilty of distribution of "cocaine base," it must find that his offense involved crack cocaine. DePierre was convicted, and the court sentenced him to the 120 months in prison mandated by the statute.  The First Circuit affirmed, rejecting DePierre's argument that §841(b)(1)(A)(iii) should be read only to apply to offenses involving crack cocaine.  Instead, it adhered to its precedent holding that "cocaine base" refers to all forms of cocaine base.

*Held:* "[C]ocaine base," as used in §841(b)(1), means not just "crack cocaine," but cocaine in its chemically basic form.  Pp. 7–18.

  (a) The most natural reading of "cocaine base" in clause (iii) is cocaine in its chemically basic form—*i.e.*, the molecule found in crack

cocaine, freebase, and coca paste. On its plain terms, then, "cocaine base" reaches more broadly than just crack cocaine. In arguing to the contrary, DePierre urges the Court to stray far from the statute's text, which nowhere contains the term "crack cocaine." The Government's reading, on the other hand, follows the words Congress chose to use. DePierre is correct that "cocaine base" is technically redundant—chemically speaking, cocaine *is* a base. But Congress had good reason to use "cocaine base"—to make clear that clause (iii) does not apply to offenses involving cocaine hydrochloride (*i.e.*, powder cocaine) or other nonbasic cocaine-related substances. At the time the statute was enacted, "cocaine" was commonly used to refer to powder cocaine, and the scientific and medical literature often uses "cocaine" to refer to *all* cocaine-related substances, including ones that are not chemically basic. Pp. 7–10.

(b) This reading of "cocaine base" is also consistent with §841(b)(1)'s somewhat confusing structure. Subsection (b)(1)(A)(ii)(II) lists "cocaine," along with "its salts, optical and geometric isomers, and salts of isomers," as elements subject to clause (ii)'s higher quantity threshold. DePierre is correct that, because "cocaine" and "cocaine base" both refer to chemically basic cocaine, offenses involving a substance containing such cocaine will always be penalized according to the lower quantity threshold of clause (iii), and never the higher threshold clause (ii) establishes for mixtures and substances containing "cocaine." But the Court does not agree that the term "cocaine" in clause (ii) is therefore superfluous—in light of the structure of subclause (II), "cocaine" is needed as the reference point for "salts" and "isomers," which would otherwise be meaningless.

The term "cocaine" in clause (ii) also performs another critical function. Clause (iii) penalizes offenses involving a mixture or substance "described in clause (ii) which contains cocaine base." Thus, clause (ii) imposes a penalty for offenses involving cocaine-related substances generally, and clause (iii) imposes a higher penalty for a subset of those substances—the ones that "contai[n] cocaine base." For this structure to work, however, §841(b)(1) must "describ[e] in clause (ii)" substances containing chemically basic cocaine, which then comprise the subset described in clause (iii). Congress thus had good reason to include the term "cocaine" in clause (ii), and the slight inconsistency created by its use of "cocaine base" in clause (iii) is insufficient reason to adopt DePierre's interpretation. Pp. 10–13.

(c) DePierre's additional arguments are unpersuasive. First, the records of the 1986 congressional hearings do not support his contention that Congress was exclusively concerned with offenses involving crack cocaine. Second, reading "cocaine base" to mean chemically basic cocaine, rather than crack cocaine, does not lead to an absurd re-

Syllabus

sult.  Third, the fact that "cocaine base" in the Federal Sentencing Guidelines is defined as "crack" does not require that the statutory term be interpreted the same way.  Fourth, the statute is sufficiently clear that the rule of lenity does not apply in DePierre's favor. Pp. 13–18.

599 F. 3d 25, affirmed.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, GINSBURG, BREYER, ALITO, and KAGAN, JJ., joined, and in which SCALIA, J., joined except for Part III–A. SCALIA, J., filed an opinion concurring in part and concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 09–1533

---

### FRANTZ DePIERRE, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 9, 2011]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

At the time of petitioner's conviction and sentence, federal law mandated a minimum 10-year sentence for persons convicted of certain drug offenses, 21 U. S. C. §841(a), including those involving 50 grams or more of "a mixture or substance . . . which contains cocaine base," §841(b)(1)(A)(iii), and a minimum 5-year sentence for offenses involving 5 grams or more of the same, §841(b)(1)(B)(iii). This case requires us to decide whether the term "cocaine base" as used in this statute refers generally to cocaine in its chemically basic form or exclusively to what is colloquially known as "crack cocaine." We conclude that "cocaine base" means the former.

## I

### A

As a matter of chemistry, cocaine is an alkaloid with the molecular formula $C_{17}H_{21}NO_4$. Webster's Third New International Dictionary 434 (2002). An alkaloid is a base— that is, a compound capable of reacting with an acid to form a salt.[1] *Id.*, at 54, 180; see also Brief for Individual

---

[1] There are more detailed theories of how acids and bases interact.

Physicians and Scientists as *Amici Curiae* 2–3 (hereinafter Physicians Brief).  Cocaine is derived from the coca plant native to South America.  The leaves of the coca plant can be processed with water, kerosene, sodium carbonate, and sulphuric acid to produce a paste-like substance.  R. Weiss, S. Mirin, & R. Bartel, Cocaine 10 (2d ed. 1994).  When dried, the resulting "coca paste" can be vaporized (through the application of heat) and inhaled, *i.e.*, "smoked."  See United States Sentencing Commission, Special Report to the Congress: Cocaine and Federal Sentencing Policy 11–12 (1995) (hereinafter Commission Report).  Coca paste contains $C_{17}H_{21}NO_4$—that is, cocaine in its base form.

Dissolving coca paste in water and hydrochloric acid produces (after several intermediate steps) cocaine hydrochloride, which is a salt with the molecular formula $C_{17}H_{22}NO_4^+Cl^-$.  *Id.*, at 12; Physicians Brief 3.  Cocaine hydrochloride, therefore, is not a base.  It generally comes in powder form, which we will refer to as "powder cocaine."  It is usually insufflated (breathed in through the nose), though it can also be ingested or diluted in water and injected.  Because cocaine hydrochloride vaporizes at a much higher temperature than chemically basic cocaine (at which point the cocaine molecule tends to decompose), it is generally not smoked.  See Commission Report 11, n. 15, 12–13.

Cocaine hydrochloride can be converted into cocaine in its base form by combining powder cocaine with water and a base, like sodium bicarbonate (also known as baking soda).  *Id.*, at 14.  The chemical reaction changes the cocaine hydrochloride molecule into a chemically basic

_____

For our purposes, it is sufficient to note the fundamental proposition that a base and an acid can combine to form a salt, and all three are different types of compounds.  See generally Brief for Individual Physicians and Scientists as *Amici Curiae* 8; A Dictionary of Chemistry 6–7, 62–63, 496 (J. Dainith ed., 5th ed. 2004).

cocaine molecule, Physicians Brief 4, and the resulting solid substance can be cooled and broken into small pieces and then smoked, Commission Report 14. This substance is commonly known as "crack" or "crack cocaine."[2] Alternatively, powder cocaine can be dissolved in water and ammonia (also a base); with the addition of ether, a solid substance—known as "freebase"—separates from the solution, and can be smoked. *Id.*, at 13. As with crack cocaine, freebase contains cocaine in its chemically basic form. *Ibid.*

Chemically, therefore, there is no difference between the cocaine in coca paste, crack cocaine, and freebase—all are cocaine in its base form. On the other hand, cocaine in its base form and in its salt form (*i.e.*, cocaine hydrochloride) are chemically different, though they have the same active ingredient and produce the same physiological and psychotropic effects. See *id.*, at 14–22. The key difference between them is the method by which they generally enter the body; smoking cocaine in its base form—whether as coca paste, freebase, or crack cocaine—allows the body to absorb the active ingredient quickly, thereby producing a shorter, more intense high than obtained from insufflating cocaine hydrochloride. *Ibid.*; see generally *Kimbrough* v. *United States*, 552 U. S. 85, 94 (2007).

## B

In 1986, increasing public concern over the dangers associated with illicit drugs—and the new phenomenon of crack cocaine in particular—prompted Congress to revise the penalties for criminal offenses involving cocaine-related substances. See *id.*, at 95–96. At the time, federal law generally tied the penalties for drug offenses to both the type of drug and the quantity involved, with no pro-

———————

[2] Though the terms "crack" and "crack cocaine" are interchangeable, in this opinion we adopt DePierre's practice and generally employ the latter.

vision for mandatory minimum sentences. See, *e.g.*, §841(b)(1) (1982 ed., Supp. III). After holding several hearings specifically addressing the emergence of crack cocaine, Congress enacted the Anti-Drug Abuse Act of 1986 (ADAA), 100 Stat. 3207, which provided mandatory minimum sentences for controlled-substance offenses involving specific quantities of drugs.

As relevant here, the ADAA provided a mandatory 10-year sentence for certain drug offenses involving 5 kilograms or more of "a mixture or substance containing a detectable amount of" various cocaine-related elements, including coca leaves, cocaine, and cocaine salts; it also called for the same sentence for offenses involving only 50 grams or more of "a mixture or substance . . . *which contains cocaine base.*" ADAA, §1002, 100 Stat. 3207–2 (amending §§841(b)(1)(A)(ii)–(iii)) (emphasis added). The ADAA also stipulated a mandatory 5-year sentence for offenses involving 500 grams of a mixture or substance containing coca leaves, cocaine, and cocaine salts, or 5 grams of a mixture or substance containing "cocaine base." *Id.*, at 3207–3 (amending §§841(b)(1)(B)(ii)–(iii)).

Thus, the ADAA established a 100-to-1 ratio for the threshold quantities of cocaine-related substances that triggered the statute's mandatory minimum penalties. That is, 5 grams or more of "a mixture or substance . . . which contains cocaine base" was penalized as severely as 100 times that amount of the other cocaine-related elements enumerated in the statute. These provisions were still in effect at the time of petitioner's conviction and sentence.[3] See §§841(b)(1)(A)–(B) (2000 ed. and Supp. V).

---

[3] Due to a recent amendment, the quantity ratio in §841(b)(1) is now roughly 18-to-1, but otherwise the relevant statutory provisions are unchanged from those in effect at the time DePierre was sentenced. See Fair Sentencing Act of 2010 (FSA), §2, 124 Stat. 2372 (changing the quantity in §841(b)(1)(A)(iii) from 50 to 280 grams and in subparagraph (B)(iii) from 5 to 28 grams).

The United States Sentencing Commission subsequently promulgated Sentencing Guidelines for drug-trafficking offenses. Under the Guidelines, the offense levels for drug crimes are tied to the drug type and quantity involved. See United States Sentencing Commission, Guidelines Manual §2D1.1(c) (Nov. 2010) (USSG). The Commission originally adopted the ADAA's 100-to-1 ratio for offenses involving "cocaine" and "cocaine base," though instead of setting only two quantity thresholds, as the ADAA did, the Guidelines "set sentences for the full range of possible drug quantities." Commission Report 1; see generally *Kimbrough*, 552 U. S., at 96–97.[4]

The original version of §2D1.1(c) did not define "cocaine base" as used in that provision, but in 1993 the Commission issued an amendment to explain that "'[c]ocaine base,' for the purposes of this guideline, means 'crack,'" that is, "the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." USSG App. C, Amdt. 487 (effective Nov. 1, 1993); see also USSG §2D1.1(c), n. (D). The Commission noted that "forms of cocaine base other than crack (*e.g.*, coca paste . . .) will be treated as cocaine." USSG App. C, Amdt. 487.[5]

## C

In April 2005, petitioner Frantz DePierre sold two bags

---

[4] In 2007 the Commission increased the quantity of cocaine base required to trigger each offense level, reducing the cocaine base-to-cocaine sentencing ratio under the Guidelines. See USSG Supp. App. C, Amdt. 706 (effective Nov. 1, 2007). Unless otherwise noted, we cite to the current versions of the relevant Guidelines provisions.

[5] The Guidelines' Drug Quantity Table only lists "cocaine" and "cocaine base" among its enumerated controlled substances, but the application notes make clear that the term "cocaine" includes "ecgonine and coca leaves," as well as "salts, isomers, and salts of isomers" of cocaine. §2D1.1(c), and comment., n. 5.

of drugs to a Government informant. DePierre was subsequently indicted on a charge of distributing 50 grams or more of cocaine base under §§841(a)(1) and (b)(1)(A)(iii).[6] At trial, a Government chemist testified that the substance in the bags, which weighed 55.1 grams, was "cocaine base." Tr. 488, 490. She was not able to identify any sodium bicarbonate. *Id.*, at 499. A police officer testified that the substance in question was "off-white [and] chunky." *Id.*, at 455.

DePierre asked the District Court to instruct the jury that, in order to find him guilty of distribution of cocaine base, it must find that his offense involved "the form of cocaine base known as crack cocaine." App. in No. 08–2101 (CA1), p. 43. His proposed jury instruction defined "crack" identically to the Guidelines definition. See *id.*, at 43–44; see also USSG §2D1.1(c), n. (D). In addition, DePierre asked the court to instruct the jury that "[c]hemical analysis cannot establish a substance as crack because crack is chemically identical to other forms of cocaine base, although it can reveal the presence of sodium bicarbonate, which is usually used in the processing of crack." App. in No. 08–2101, at 44.

The court, however, instructed the jury that "the statute that's relevant asks about cocaine base. Crack cocaine is a form of cocaine base, so you'll tell us whether or not what was involved is cocaine base . . . ." Tr. 585 (paragraph break omitted). The jury form asked whether the offense involved "over 50 grams of cocaine base." App. to Pet. for Cert. 17a. The jury found DePierre guilty of distributing 50 grams or more of cocaine base, and the court sentenced DePierre to 120 months in prison as required by the statute.

––––––––––

[6] DePierre was also indicted for distribution of powder cocaine under §841(a)(1) and possession of a firearm with an obliterated serial number under 18 U. S. C. §922(k). He was convicted by jury of the former offense and pleaded guilty to the latter prior to trial.

The United States Court of Appeals for the First Circuit affirmed, rejecting DePierre's argument that §841(b)(1)(A)(iii) should be read only to apply to offenses involving crack cocaine. 599 F. 3d 25, 30–31 (2010). While noting the division on this question among the Courts of Appeals, *id.*, at 30–31, and nn. 3, 4, the First Circuit adhered to its own precedent and "read the statute according to its terms," holding that "'cocaine base' refers to 'all forms of cocaine base, including but not limited to crack cocaine.'" *Id.*, at 30–31 (quoting *United States* v. *Anderson*, 452 F. 3d 66, 86–87 (CA1 2006)). We granted certiorari to resolve the longstanding division in authority among the Courts of Appeals on this question. 562 U. S. \_\_\_ (2010).

## II
### A

We begin with the statutory text. See *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 241 (1989). Section 841(b)(1)(A) provides a mandatory 10-year minimum sentence for certain drug offenses involving

"(ii) 5 kilograms or more of a mixture or substance containing a detectable amount of—
"(I) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;
"(II) cocaine, its salts, optical and geometric isomers, and salts of isomers;
"(III) ecgonine, its derivatives, their salts, isomers, and salts of isomers; or
"(IV) any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subclauses (I) through (III); [or]
"(iii) 50 grams or more of a mixture or substance de-

scribed in clause (ii) which contains cocaine base."[7]

We agree with the Government that the most natural reading of the term "cocaine base" is "cocaine in its base form"—*i.e.*, $C_{17}H_{21}NO_4$, the molecule found in crack cocaine, freebase, and coca paste. On its plain terms, then, "cocaine base" reaches more broadly than just crack cocaine. In arguing to the contrary, DePierre asks us to stray far from the statute's text, as the term "crack cocaine" appears nowhere in the ADAA (or the United States Code, for that matter). While the Government's reading is not without its problems,[8] that reading follows from the words Congress chose to include in the text. See *United States* v. *Rodriquez*, 553 U. S. 377, 384 (2008) (eschewing an interpretation that was "not faithful to the statutory text"). In short, the term "cocaine base" is more plausibly read to mean the "chemically basic form of cocaine," Brief for United States 15, than it is "crack cocaine," Brief for

———————

[7]As noted earlier, §841(b)(1)(B) calls for a mandatory minimum 5-year sentence for offenses involving exactly the same substances; the only difference in subparagraph (B) is that the threshold quantity in clause (ii) is 500 grams, and in clause (iii) it is 5 grams. Because the 100-to-1 ratio is a feature of both §§841(b)(1)(A) and (B), and those subparagraphs are identical in all other respects, throughout this opinion we use the terms "clause (ii)" and "clause (iii)" to refer to those clauses as present in either subparagraph.

[8]The Government urges us to give "cocaine base" its "settled, unambiguous scientific meaning," *i.e.*, "the form of cocaine classified chemically as a base, with the chemical formula $C_{17}H_{21}NO_4$ and a particular molecular structure." Brief for United States 20; cf. *McDermott Int'l, Inc.* v. *Wilander*, 498 U. S. 337, 342 (1991) ("In the absence of contrary indication, we assume that when a statute uses . . . a term [of art], Congress intended it to have its established meaning"). But the scientifically proper appellation for $C_{17}H_{21}NO_4$ is "cocaine" *tout court*, and the Government cites no source that uses "cocaine base" to refer to $C_{17}H_{21}NO_4$ (save lower-court opinions construing the statute at issue in this case). Therefore, there is no "settled meaning"—scientific or otherwise—of "cocaine base" for us to apply to §841(b)(1).

Petitioner 24, 28.[9]

We agree with DePierre that using the term "cocaine base" to refer to $C_{17}H_{21}NO_4$ is technically redundant; as noted earlier, chemically speaking cocaine *is* a base. If Congress meant in clause (iii) to penalize more severely offenses involving "a mixture or substance . . . which contains" cocaine in its base form it could have simply (and more correctly) used the word "cocaine" instead. But Congress had good reason to use "cocaine base" in the ADAA—to distinguish the substances covered by clause (iii) from other cocaine-related substances. For example, at the time Congress enacted the statute, the word "cocaine" was commonly used to refer to cocaine hydrochloride, *i.e.*, powder cocaine. See, *e.g.*, *United States* v. *Montoya de Hernandez*, 473 U. S. 531, 536, 544 (1985) (repeatedly referring to cocaine hydrochloride as "cocaine"); "Crack" Cocaine, Hearing before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, 99th Cong., 2d Sess., 94 (1986) (hereinafter Crack Cocaine Hearing) (prepared statement of David L. Westrate, Assistant Administrator, Drug Enforcement Admin., Dept. of Justice) (discussing production of "a white, crystalline powder, cocaine hydrochloride, otherwise known simply as cocaine").

To make things more confusing, in the scientific and medical literature the word "cocaine" is often used to refer to *all* cocaine-related substances, including powder cocaine. See, *e.g.*, J. Fay, The Alcohol/Drug Abuse Dictionary and Encyclopedia 26–27 (1988); Weiss et al., Cocaine, at 15–25; R. Lewis, Hawley's Condensed Chemical Dic-

─────────

[9] The statute itself gives us good reason to reject DePierre's reading. Substituting "crack cocaine" for "cocaine base" would mean that clause (iii) only applies to a "mixture or substance . . . which contains [crack cocaine]." But crack cocaine is itself a "substance" involved in drug offenses; it is the end product that is bought, sold, and consumed. We are aware of no substance that "contains" crack cocaine.

tionary 317 (15th ed. 2007). Accordingly, Congress' choice to use the admittedly redundant term "cocaine base" to refer to chemically basic cocaine is best understood as an effort to make clear that clause (iii) does not apply to offenses involving powder cocaine or other nonbasic cocaine-related substances.

B

Notwithstanding DePierre's arguments to the contrary, reading "cocaine base" to mean chemically basic cocaine is also consistent with §841(b)(1)'s somewhat confounding structure. DePierre is correct that the interpretation we adopt today raises the question why Congress included the word "cocaine" in subclause (II) of clause (ii). That subclause lists "*cocaine*, its salts, optical and geometric isomers, and salts of isomers" as elements subject to clause (ii)'s higher quantity threshold. §§841(b)(1)(A)(ii)(II), (B)(ii)(II) (emphasis added). If, as we conclude, the terms "cocaine" and "cocaine base" both mean chemically basic cocaine, offenses involving a mixture or substance which contains such cocaine will always be penalized according to the lower quantity thresholds of clause (iii), and never the higher quantity thresholds clause (ii) establishes for mixtures and substances containing "cocaine."[10]

While this much is true, we do not agree with DePierre that the word "cocaine" in subclause (II) is therefore superfluous. For without the word "cocaine" subclause (II) makes no sense: It would provide a minimum sentence for offenses involving a specified quantity of simply "its salts, optical and geometric isomers, and salts of isomers." In

―――――――――

[10] DePierre makes a similar argument with respect to coca leaves: Because they contain chemically basic cocaine, he contends, under the Government's interpretation offenses involving coca leaves will never be subject to the lower quantity threshold associated with subclause (I), rendering that provision superfluous. For reasons discussed later, see *infra*, at 15–16, we are not convinced.

light of the structure of the subclause, the word "cocaine" is needed as the reference point for "salts" and "isomers."

The word "cocaine" in subclause (II) also performs another critical function. Clause (iii) penalizes offenses involving "a mixture or substance *described in clause (ii)* which contains cocaine base." §§841(b)(1)(A)(iii), (B)(iii) (emphasis added). In other words, clause (ii) imposes a penalty for offenses involving cocaine-related substances generally, and clause (iii) imposes a higher penalty for a subset of those substances—the ones that "contai[n] cocaine base." For this structure to work, however, §841(b)(1) must "describ[e] in clause (ii)" substances containing chemically basic cocaine, which then comprise the subset described in clause (iii). If such substances were not present in clause (ii), clause (iii) would only apply to substances that contain both chemically basic cocaine and one of the *other* elements enumerated in clause (ii). Presumably, the result would be that clause (iii) would not apply to crack cocaine, freebase, or coca paste offenses, as there is no indication that, in addition to "cocaine base" (*i.e.*, $C_{17}H_{21}NO_4$), those substances contain cocaine "salts" (*e.g.*, cocaine hydrochloride), ecgonine, or any of the other elements enumerated in clause (ii). In short, the exclusion of "cocaine" from clause (ii) would result in clause (iii) effectively describing a null set, which obviously was not Congress' intent.

Of course, this redundancy could have been avoided by simply drafting clause (iii) to penalize offenses involving "a mixture or substance which contains cocaine base," without reference to clause (ii)—that is, Congress could have drafted clause (iii) to specify a *separate* set of cocaine-related substances, not a *subset* of those in clause (ii). That we may rue inartful legislative drafting, however, does not excuse us from the responsibility of construing a

statute as faithfully as possible to its actual text.[11]  And as noted earlier, there is no textual support for DePierre's interpretation of "cocaine base" to mean "crack cocaine."

We also recognize that our reading of "cocaine" in subclause (II) and "cocaine base" in clause (iii) to both refer to chemically basic cocaine is in tension with the usual rule that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 711, n. 9 (2004) (internal quotation marks omitted).  However, because "Congress sometimes uses slightly different language to convey the same message," *Deal* v. *United States*, 508 U. S. 129, 134 (1993) (internal quotation marks omitted), we must be careful not to place too much emphasis on the marginal semantic divergence between the terms "cocaine" and "cocaine base."  As we have already explained, Congress had good reason to employ the latter term in clause (iii), and the slight inconsistency in nomenclature is insufficient reason to adopt DePierre's interpretation.  Cf. *Public Lands Council* v. *Babbitt*, 529 U. S. 728, 746–747 (2000)

---

[11] At the time the ADAA was enacted, the definition of "narcotic drug" in the same subchapter of the United States Code included, as relevant, the following:

"(C) Coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed.

"(D) Cocaine, its salts, optical and geometric isomers, and salts of isomers.

"(E) Ecgonine, its derivatives, their salts, isomers, and salts of isomers.

"(F) Any compound, mixture, or preparation which contains any quantity of any of the substances referred to in [the preceding] subparagraphs . . . . " 21 U. S. C. §802(17) (1982 ed., Supp. III).

Accordingly, the likely explanation for the ADAA's curious structure is that Congress simply adopted this preexisting enumeration of cocaine-related controlled substances, and then engrafted clause (iii) to provide enhanced penalties for the subset of offenses involving chemically basic cocaine.

(suggesting that a "statute's basic purpose" might support the conclusion that "two sets of different words mean the same thing").

## III

DePierre offers four additional arguments in support of his view that the term "cocaine base" in clause (iii) is best read to mean "crack cocaine." We do not find them convincing.

## A

DePierre first argues that we should read "cocaine base" to mean "crack cocaine" because, in passing the ADAA, Congress in 1986 intended to penalize crack cocaine offenses more severely than those involving other substances containing $C_{17}H_{21}NO_4$. As is evident from the preceding discussion, this position is not supported by the statutory text. To be sure, the records of the contemporaneous congressional hearings suggest that Congress was most concerned with the particular dangers posed by the advent of crack cocaine. See, *e.g.*, Crack Cocaine Hearing 1 (statement of Chairman Roth) ("[We] mee[t] today to examine a frightening and dangerous new twist in the drug abuse problem—the growing availability and use of a cheap, highly addictive, and deadly form of cocaine known on the streets as 'crack'"); see generally Commission Report 116–118; *Kimbrough*, 552 U. S., at 95–96.

It does not necessarily follow, however, that in passing the ADAA Congress meant for clause (iii)'s lower quantity thresholds to apply *exclusively* to crack cocaine offenses. Numerous witnesses at the hearings testified that the primary reason crack cocaine was so dangerous was because—contrary to powder cocaine—cocaine in its base form is smoked, which was understood to produce a faster, more intense, and more addictive high than powder cocaine. See, *e.g.*, Crack Cocaine Hearing 20 (statement of Dr. Robert Byck, Yale University School of Medicine)

(stating that the ability to inhale vapor "is the reason why crack, or cocaine free-base, is so dangerous"). This is not, however, a feature unique to crack cocaine, and freebase and coca paste were also acknowledged as dangerous, smokeable forms of cocaine. See, *e.g.*, *id.*, at 70 (prepared statement of Dr. Charles R. Schuster, Director, National Institute on Drug Abuse) (reporting on the shift from snorting powder cocaine to "newer more dangerous routes of administration, such as freebase smoking"); *id.*, at 19–20 (statement of Dr. Byck) (describing the damaging effects of cocaine smoking on people in Peru).

Moreover, the testimony of witnesses before Congress did not clearly distinguish between these base forms of cocaine; witnesses repeatedly used terms like "cocaine base," "freebase," or "cocaine freebase" in a manner that grouped crack cocaine with other substances containing chemically basic forms of cocaine. See, *e.g.*, Trafficking and Abuse of "Crack" in New York City, House Select Committee on Narcotics Abuse and Control, 99th Cong., 2d Sess., 258 (1986) (statement of Robert M. Stutman, Special Agent in Charge, Drug Enforcement Admin., Dept. of Justice) ("[C]ocaine in its alkaloid form [is] commonly known on the street as crack, rock, base, or freebase"); Crack Cocaine Hearing 71 (statement of Dr. Schuster) ("In other words, 'crack' is a street name for cocaine freebase"). In fact, prior to passage of the ADAA, multiple bills were introduced in Congress that imposed enhanced penalties on those who trafficked in "cocaine base," *e.g.,* S. 2787, 99th Cong., 2d Sess., §1 (1986), as well as "cocaine freebase," *e.g.,* H. R. 5394, 99th Cong., 2d Sess., §101 (1986); H. R. 5484, 99th Cong., 2d Sess., §608(a) (1986).

Given crack cocaine's sudden emergence and the similarities it shared with other forms of cocaine, this lack of clarity is understandable, as is Congress' desire to adopt a statutory term that would encompass all forms. Congress faced what it perceived to be a new threat of massive

scope. See, *e.g.*, Crack Cocaine Hearing 4 (statement of Sen. Nunn) ("[C]ocaine use, particularly in the more pure form known as crack, is at near epidemic proportions"); *id.*, at 21 (statement of Dr. Byck) ("We are dealing with a worse drug . . . than we have ever dealt with, or that anybody has ever dealt with in history"). Accordingly, Congress chose statutory language broad enough to meet that threat. As we have noted, "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils." *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75, 79 (1998). In the absence of any indication in the statutory text that Congress intended only to subject crack cocaine offenses to enhanced penalties, we cannot adopt DePierre's narrow construction. See *Lewis* v. *Chicago*, 560 U. S. ___, ___ (2010) (slip op., at 9) ("It is not for us to rewrite [a] statute so that it covers only what we think is necessary to achieve what we think Congress really intended").

B

DePierre also argues that we should read the term "cocaine base" to mean "crack cocaine," rather than chemically basic cocaine, because the latter definition leads to an absurd result. Cf. *EEOC* v. *Commercial Office Products Co.*, 486 U. S. 107, 120 (1988) (plurality opinion). He contends that, because coca leaves themselves contain cocaine, under the Government's approach an offense involving 5 grams of coca leaves will be subject to the 5-year minimum sentence in §841(b)(1)(B)(iii), even though those leaves would produce only .05 grams of smokeable cocaine. See Brief for Petitioner 41–42. While we agree that it would be questionable to treat 5 grams of coca leaves as equivalent to 500 grams of powder cocaine for minimum-sentence purposes, we are not persuaded that such a result would actually obtain in light of our decision today.

To begin with, it is a matter of dispute between the

parties whether coca leaves in their natural, unprocessed form actually contain chemically basic cocaine. Compare Brief for Petitioner 15, 17, n. 10, with Brief for United States 43. Even assuming that DePierre is correct as a matter of chemistry that coca leaves contain cocaine in its base form,[12] see Physicians Brief 2, 11, the Government has averred that it "would not be able to make that showing in court," Tr. of Oral Arg. 27, and that "coca leaves should not be treated as containing 'cocaine base' for purposes of Clause (iii)," Brief for United States 45.

It is unsurprising, therefore, that the Government in its brief disclaimed awareness of any prosecution in which it had sought, or the defendant had received, a statutory-minimum sentence enhanced under clause (iii) for an offense involving coca leaves. *Id.*, at 44. And although this question is not before us today, we note that Congress' deliberate choice to enumerate "coca leaves" in clause (ii) strongly indicates its intent that offenses involving such leaves be subject to the higher quantity thresholds of that clause. Accordingly, there is little danger that the statute will be read in the "absurd" manner DePierre fears.

C

In addition, DePierre suggests that because the Sentencing Commission has, since 1993, defined "cocaine base" to mean "crack" for the purposes of the Federal Sentencing Guidelines, we should do the same with respect to §841(b)(1). We do not agree. We have never held that, when interpreting a term in a criminal statute, deference is warranted to the Sentencing Commission's definition of the same term in the Guidelines. Cf. *Neal* v. *United States*, 516 U. S. 284, 290–296 (1996). And we

---

[12] It appears that Congress itself is of the view that coca leaves contain "cocaine," as subclause (I) exempts offenses involving "coca leaves from which cocaine . . . ha[s] been removed." §§841(b)(1)(A)(ii)(I), (B)(ii)(I).

need not decide now whether such deference would be appropriate, because the Guidelines do not purport to interpret §841(b)(1). See USSG §2D1.1(c), n. (D) ("'Cocaine base,' *for the purposes of this guideline*, means 'crack'" (emphasis added)).[13]

We recognize that, because the definition of "cocaine base" in clause (iii) differs from the Guidelines definition, certain sentencing anomalies may result. For example, an offense involving 5 grams of crack cocaine and one involving 5 grams of coca paste both trigger a minimum 5-year sentence under §841(b)(1)(B)(iii). But defendants convicted of offenses involving only 4 grams of each substance—which do not trigger the statutory minimums— would likely receive different sentences, because of the Guidelines' differential treatment of those substances with respect to offense level.[14] Compare USSG §2D1.1(c)(9) (providing an offense level of 22 for at least 4 grams of "cocaine base," *i.e.*, "crack") with §2D1.1(c)(14) (providing an offense level of 12 for less than 25 grams of "cocaine," which, under the Guidelines, includes coca paste). As we have noted in previous opinions, however, such disparities are the inevitable result of the dissimilar operation of the fixed minimum sentences Congress has provided by stat-

––––––––––

[13] We also disagree with DePierre's contention that Congress' failure to reject the Guidelines definition of "cocaine base" means that it has effectively adopted that interpretation with respect to the statute. See *Kimbrough* v. *United States*, 552 U. S. 85, 106 (2007) ("Ordinarily, we resist reading congressional intent into congressional inaction").

[14] In defining "cocaine base" as "crack," the Commission explained that "forms of cocaine base other than crack" are treated as "cocaine" for purposes of the Guidelines. USSG App. C, Amdt. 487 (effective Nov. 1, 1993). This includes coca paste, which the Commission described as "an intermediate step in the processing of coca leaves into cocaine hydrochloride." *Ibid.* As we have explained, however, coca paste is a smokeable form of cocaine in its own right, and we see no reason why, as a statutory matter, it should be subject to lesser penalties than crack or freebase.

ute and the graduated sentencing scheme established by the Guidelines. See *Kimbrough*, 552 U. S., at 107–108; *Neal*, 516 U. S., at 291–292. Accordingly, we reject De-Pierre's suggestion that the term "cocaine base" as used in clause (iii) must be given the same definition as it has under the Guidelines.

## D

Finally, DePierre argues that, because §841(b)(1) is at the very least ambiguous, the rule of lenity requires us to interpret the statute in his favor. See *United States* v. *Santos*, 553 U. S. 507, 514 (2008) ("The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them"). As evinced by the preceding discussion, we cannot say that the statute is crystalline. The rule, however, is reserved for cases where, "after seizing everything from which aid can be derived, the Court is left with an ambiguous statute." *Smith* v. *United States*, 508 U. S. 223, 239 (1993) (internal quotation marks and alterations omitted). Applying the normal rules of statutory construction in this case, it is clear that Congress used the term "cocaine base" in clause (iii) to penalize more severely not only offenses involving "crack cocaine," but those involving substances containing chemically basic cocaine more generally. There is no persuasive justification for reading the statute otherwise. Because the statutory text allows us to make far more than "a guess as to what Congress intended," *Reno* v. *Koray*, 515 U. S. 50, 65 (1995) (internal quotation marks omitted), the rule of lenity does not apply in DePierre's favor.

\*    \*    \*

We hold that the term "cocaine base" as used in §841(b)(1) means not just "crack cocaine," but cocaine in its chemically basic form. We therefore affirm the judgment of the Court of Appeals.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

No. 09–1533

---

## FRANTZ DePIERRE, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[June 9, 2011]

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I concur in the Court's judgment and in all of its opinion except for Part III–A, which needlessly contradicts De-Pierre's version of legislative history. Our holding today is that the statutory term "cocaine base" refers to cocaine base, rather than, as DePierre contends, one particular type of cocaine base. This holding is in my view obvious, and the Court does not disagree. It begins its discussion of the legislative history by saying that DePierre's position "is not supported by the statutory text," *ante*, at 13; and ends the discussion by saying that "[i]n the absence of any indication in the statutory text that Congress intended only to subject crack cocaine offenses to enhanced penalties, we cannot adopt DePierre's narrow construction," *ante*, at 15.

Everything in-between could and should have been omitted. Even if Dr. Byck had *not* lectured an undetermined number of likely somnolent Congressmen on "the damaging effects of cocaine smoking on people in Peru," *ante*, at 14, we would *still* hold that the words "cocaine base" mean cocaine base. And here, as always, the needless detour into legislative history is not harmless. It conveys the mistaken impression that legislative history *could* modify the text of a criminal statute as clear as this.

In fact, however, even a hypothetical House Report expressing the Committee's misunderstanding (or perhaps just the Committee staff's misunderstanding, who knows?) that "cocaine base means crack cocaine" could not have changed the outcome of today's opinion.